**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| ROBERT NUSSBAUM, | ) | CASE NO. 5:22-CV-01763-SL |
| Plaintiff, | ) | |
| | ) | U.S. DISTRICT JUDGE |
| | ) | SARA LIOI |
| v. | ) | |
| | ) | U.S. MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL | ) | JENNIFER DOWDELL ARMSTRONG |
| SECURITY ADMINISTRATION, | ) | |
| Defendant, | ) | **REPORT AND RECOMMENDATION** |
| | ) | |

## I.    INTRODUCTION

Plaintiff Robert Nussbaum ("Mr. Nussbaum") seeks judicial review of the final decision of the Commissioner of Social Security ("the Commissioner") denying his applications for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"). (ECF Doc. 1). U.S. District Judge Sara E. Lioi has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). Pursuant to Local Civil Rule 72.2, this matter was referred to me for preparation of a Report and Recommendation. For the reasons set forth below, I RECOMMEND that the Court AFFIRM the Commissioner's decision.

## II.    PROCEDURAL HISTORY[1]

On August 31, 2020, Mr. Nussbaum filed applications for DIB and SSI, alleging a disability onset date of February 4, 2020. (Tr. 487-90, 491-96).[2] These applications were denied initially and upon reconsideration. (Tr. 364-68, 369-73, 381-85, 386-88). Mr. Nussbaum requested

---

[1] Administrative law judges denied two of Mr. Nussbaum's prior applications. Mr. Nussbaum is not requesting that either of these decisions be reopened.
[2] The administrative transcript ("Tr.") is located at ECF Doc. 5 on CM/ECF.

a hearing before an administrative law judge ("ALJ"). (Tr. 389, 426-30). On August 3, 2021, the

ALJ held an online video hearing due to the COVID-19 pandemic, during which Mr. Nussbaum,

represented by counsel, and a vocational expert ("VE") testified. (Tr. 229-252). At the hearing,

Mr. Nussbaum's counsel made an oral motion to amend the alleged onset date to October 1, 2020,

and the ALJ granted the motion (Tr. 197).

On September 24, 2021, the ALJ issued a written decision finding that Mr. Nussbaum was

not disabled. (Tr. 197-223). The ALJ's decision became final on December 5, 2022, when the

Appeals Council denied further review. (Tr. 1-7). Mr. Nussbaum filed a Complaint on October 4,

2022. (ECF Doc. 1). He asserts the following assignments of error:

(1) Whether the Administrative Law Judge erred in the amount of persuasiveness assigned to
the opinions of Dr. Ganta, the treating physician.

(2) Whether the Administrative Law Judge provided a fair and full evaluation of Plaintiff's
claim when she failed to have medical expert testimony.

(3) Whether evidence submitted after the hearing is new and material evidence warranting
remand.

(ECF Doc. 8, PageID#1099).

## III.     BACKGROUND INFORMATION[3]

### A.  Personal, Educational, and Vocational Experience

Mr. Nussbaum was born in 1976, and he was 44 years old on the amended alleged disability

onset date. (Tr. 221). He has a high school education, but he does not have a high school diploma.

(Tr. 221, 236). He lives with his wife, and he has no children. (Tr. 236). At the time of the hearing,

he had a driver's license. (*Id.*). His past relevant work was employment as a dishwasher and

groundskeeper. (Tr. 247, 565).

---

[3] Because Mr. Nussbaum's arguments revolve around his physical impairments, summary of the relevant evidence is
limited to those related to such impairments.

2

### B.  **Relevant Hearing Testimony**

#### 1.  *Mr. Nussbaum's Testimony*

Mr. Nussbaum testified that his back pain is worsened by sitting or standing too long. (Tr. 244). His back pain is also worsened when he eats "too much fatty foods," resulting in high triglycerides that, with his pancreatitis, causes "instant pain all the way down [his] spine in the back and then pain in the front." (*Id.*). He testified that he has tried CBD oil and a chiropractor, but it did not help. (*Id.*). He also tried ice and creams, but Mr. Nussbaum testified that he could not "really do a whole lot until [his] levels go lower on [his] triglycerides because high triglycerides cause the pancreatitis to flare-up." (*Id.*).

Mr. Nussbaum further testified that his lower back pain and medications prevented him from being able to go to work or resulted in him missing work. (Tr. 245). He stated that his medications cause drowsiness, tiredness, and nausea. (*Id.*). He testified that when he wakes up, he must wait "until [his] heart starts working good in the morning" because how he wakes up depends on the day. (*Id.*). He also testified that he has had to call off work due to his back pain. (*Id.*).

Regarding his glycogen storage disease, Mr. Nussbaum testified that he has symptoms of back pain, hyperglycemia, and high triglycerides that cause muscle weakness and tiredness. (Tr. 246).

#### 2.  *Vocational Expert's Testimony*

The vocational expert ("VE") testified that Mr. Nussbaum's past relevant work was employment as a groundskeeper and dishwasher. (Tr. 247). As a first hypothetical, the ALJ asked whether a hypothetical individual with Mr. Nussbaum's age, education, and work experience could perform Mr. Nussbaum's past work if limited to work at the light exertional level and is specifically limited, in relevant part, to occasionally lifting and carrying 20 pounds and frequently

3

lifting and carrying 10 pounds, with sitting; standing and walking for up to six hours in a workday with only occasional push and pull in both upper and lower extremities bilaterally; occasionally climbing ramps and stairs; never climbing ladders, ropes, or scaffolds; occasionally balancing, stooping, kneeling, crouching, and crawling; no unprotected heights; and never moving mechanical parts. (Tr. 248). The VE opined that this individual could perform no past work, but that this individual could perform work as an office cleaner, mail clerk, and bench assembler. (Tr. 248-49).

As a second hypothetical, the ALJ asked whether a hypothetical individual with the same limitations as the first hypothetical except limited to the sedentary exertional level could perform Mr. Nussbaum's past work. (Tr. 249). The VE opined that the individual could not perform past work, but could perform work as a document preparer, addresser, and table worker. (*Id.*).

If this individual was off task for 20% of the workday, the VE opined that there would be no work available. (Tr. 250). The VE additionally opined that absenteeism becomes work preclusive where an individual is absent greater than two days a month. (*Id.*). If an individual would need to take approximately three to four breaks –lasting approximately ten to fifteen minutes –in addition to the morning, lunch, and afternoon breaks, the VE opined that this limitation would require significant accommodation, and that there would be no work available for this individual. (Tr. 251). Finally, the VE opined that if the individual limited to the sedentary exertional level required elevating their legs to 90 degrees, this individual would be unable to maintain competitive employment. (*See id.*). However, if the individual were limited to the sedentary exertional required elevating their legs to around 45 degrees, this individual would not be precluded from work. (*Id.*).

### C.  Relevant Non-Medical/Medical Opinion Evidence

4

## 1. *State Agency Medical Consultants*

On November 17, 2020, Dr. David Knierim, M.D., reviewed the medical record at the initial level of consideration. Dr. Knierim adopted the findings of the prior ALJ's decision and found that Mr. Nussbaum was limited to light work with occasional push and/or pull with both upper and lower extremities; could never climb ladders, ropers, or scaffolds, but could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; and should avoid workplace hazards such as unprotected heights or exposure to dangerous moving machinery. (Tr. 328-29, 339-40). At the reconsideration level, Dr. Leslie Green, M.D., affirmed these same limitations. (Tr. 350-51, 359-60).

## 2. *Chitra Ganta, M.D.*

### a. **October 2020 Follow-Up Note**

Mr. Nussbaum's treating physician, Dr. Ganta, wrote in a follow-up note dated October 9, 2020, that Mr. Nussbaum "should not work as he has osteoporosis in the back and lawn mowing will make him have more fractures." (Tr. 790).

### b. **February 2021 Medical Source Statement**

On February 3, 2021, Dr. Ganta completed a medical source statement for Mr. Nussbaum. (Tr. 924-25). Dr. Ganta opined that Mr. Nussbaum could occasionally lift or carry five pounds; stand and/or walk for a total of one to three hours per day and without interruption for 30 minutes; sit for three to four hours per day and without interruption for 30 minutes; occasionally stoop; rarely crouch, kneel, or crawl; rarely reach and push/pull; occasionally engage in gross manipulation; was prescribed a cane and brace; needed to be able to alternate positions between sitting, standing, and walking, at will; experiences severe pain that would interfere with concentration, take the person off task, and cause absenteeism; would need to elevate his legs at

will 45 degrees; would need to elevate his legs at will 90 degrees; and would need to rest 4 to 6 hours per 8-hour work period. (Tr. 924-25). To support her assessment, Dr. Ganta listed diagnoses of hypertrophic cardiomyopathy; glycogen storage disease; congestive heart failure; lumbosacral, thoracic, and cervical spondylosis; myalgias; degenerative disc disease of the lumbar spine; mild acetabular dysplasia of the right side; and "pain all over from [glycogen] storage disease." (*Id.*). Dr. Ganta also stated that Mr. Nussbaum "cannot stand or sit for long periods and yes all the environmental restrictions would make it worse," and that his conditions "make it tough for him to work." (*Id.*).

### c.  April 2021 Letter

On April 13, 2021, Dr. Ganta wrote a letter stating that "[Mr. Nussbaum] was unable to work from October of 2020 due to medical conditions. Any assistance for him would help him." (Tr. 993).

### D.  Relevant Medical Evidence

#### 1.  *Medical Evidence Submitted to ALJ*

On July 14, 2020, Mr. Nussbaum saw a nurse due to complaints of chest pain when "working intensely" as a lawn care worker. (Tr. 647, 637). He stated that he "sometimes" had edema, but his physical examination at the time revealed no edema. (Tr. 634, 637). He denied muscle aches. (Tr. 636).

On September 30, 2020, Mr. Nussbaum saw Dr. Mahmood, a pain specialist, upon referral from Dr. Ganta and presented with chief complaints of spine pain and bilateral leg pain. (Tr. 791). Mr. Nussbaum reported that his pain was a nine on a scale of ten.  (*Id.*). Upon physical examination, Dr. Mahmood observed non-antalgic gait and found full 5/5 strength throughout the bilateral lower extremities, negative straight-leg raising test, and intact sensory findings or a

subjective report of decreased sensation in the right leg that was not in a spinal dermatomal distribution. (Tr. 794-95).

On October 9, 2020, Dr. Ganta evaluated Mr. Nussbaum during a telemedicine appointment. (Tr. 787). Mr. Nussbaum reported intermittent palpitations and stated that his Gabapentin made him feel "really tired and weak." (*Id.*). Dr. Ganta diagnosed Mr. Nussbaum with heart palpitations, atrial fibrillation, recurrent major depressive disorder, osteoporosis, and glycogen storage disease. (Tr. 790). Dr. Ganta stated that Mr. Nussbaum "has a lot of complications" from glycogen storage disease. (Tr. 791).

On November 3, 2020, Mr. Nussbaum attended another telemedicine appointment with Dr. Ganta. (Tr. 848). Mr. Nussbaum reported that he was still experiencing back pain. (*Id.*). He also stated that he was taking Gabapentin to help ease his pain, but it made him sleepy in the morning. (*Id.*). Dr. Ganta's diagnoses for Mr. Nussbaum were hypertrophic cardiomyopathy and recurrent major depressive disorder. (Tr. 851).

On November 12, 2020, Mr. Nussbaum returned to Dr. Mahmood for a follow-up appointment regarding Mr. Nussbaum's continued complaints of spine bilateral and leg pain, and to review his EMG results. (Tr. 839). He rated his spine and bilateral pain as nine on a scale of ten and described the pain as "burning, stinging, spasm, weak, needles, [and] spasm." (*Id.*). While pain remained at baseline, Mr. Nussbaum reported to Dr. Mahmood that he did "feel the [M]obic has been helpful." (*Id.*). Dr. Mahmood diagnosed myalgia, lumbosacral spondylosis, cervical spondylosis, glycogen storage disease, hypertrophic cardiomyopathy, and other chronic pain. (Tr. 844). Mr. Nussbaum received a trigger point injection in the office. (Tr. 847). His cervical spine x-ray demonstrated no acute process (Tr. 856). His thoracic, sacrum, and lumbar spine x-rays

demonstrated mild degenerative changes. (Tr. 860, 864, 867). The EMG of his bilateral extremities was negative. (Tr. 843).

On January 12, 2021, Mr. Nussbaum reported to Dr. Ganta that he was still experiencing back pain. (Tr. 835). He stated that Gabaprentin and Meloxicam were helpful during the night, but during the day he "has a hard time." (*Id.*). He rated his pain as a nine on a scale of ten and reported that his medications were making him sleepy during the day. (*Id.*). He reported wrist pain and stiffness. (*Id.*). Dr. Ganta observed that his wrist was mildly swollen. (*Id.*). Dr. Ganta assessed Mr. Nussbaum with hip pain, wrist pain, and bilateral back pain; increased Mr. Nussbaum's Meloxicam dosage; ordered x-rays and blood work for his wrist pain; and recommended bed rest for two to three days for his back pain. (Tr. 838).

Mr. Nussbaum's January 13, 2021, X-rays showed no acute osseous finding for his bilateral wrists. (Tr. 928). His bilateral hips x-rays showed no acute osseous findings and mild right acetabular dysplasia. (*Id.*).

On February 8, 2021, Mr. Nussbaum met with Dr. Bradley Pierce, an orthopedic specialist, upon referral by Dr. Ganta. (Tr. 927). Mr. Nussbaum's chief complaint was new pain in his right hip. (*Id.*). He reported that his pain "can be on the lateral aspect, groin, and into his buttock." (*Id.*). Mr. Nussbaum also reported that he had right hip pain "most of his life." (*Id.*). Dr. Pierce observed that Mr. Nussbaum had some mild dysplasia of the right hip, but also noted that he did not have any arthritic changes. (*Id.*). Based upon Mr. Nussbaum's physical exam, Dr. Pierce had a "suspicion" that Mr. Nussbaum's condition "may be more lumbar related and most likely a pars defect." (*Id.*). Upon physical exam, Mr. Nussbaum had limited motion of the lumbar spine, negative straight leg raise, positive Stork test, and tenderness over the SI joints "right greater than left." (*Id.*).

Mr. Nussbaum's February 2021 MRI showed mild lumbar facet disease with no focal disc protrusions. (Tr. 938). On April 13, 2021, Dr. Ganta interpreted this MRI to show degenerative disc disease and "minimal facet arthritis." (Tr. 970).

On March 4, 2021, Mr. Nussbaum reported to Dr. Cyril Ofori that he had fatigue and weakness; balance problems; chest pain two to three times the week prior for approximately four to five minutes; heart palpitations; and bilateral edema a few times a week. (Tr. 1002). He also reported experiencing lightheadedness and weakness, but denied experiencing dizziness, near syncope, syncope, frequent falls, headaches, blurry vision, and double vision or lack of coordination. (Tr. 1003). Upon exam, Mr. Nussbaum had regular heart and rhythm, normal PMI, normal S1 and S2 heart sounds other than known physiologically split S2, no audible rubs or murmurs, clear lungs to auscultation with normal respiratory effort, and no joint tenderness. (Tr. 1003-04). Mr. Nussbaum presented as healthy-appearing, well-nourished, alert, and with awake constitutional status. (Tr. 1003). With respect to Mr. Nussbaum's hypertrophic obstructive cardiomyopathy, Dr. Ofori observed that Mr. Nussbaum "appears to [be] doing quite well at this particular time." (Tr. 1004). Regarding Mr. Nussbaum's post status mitral valve repair, Dr. Ofori observed that Mr. Nussbaum "continues to do remarkably well." (*Id.*). With respect to Mr. Nussbaum's hypertriglyceridemia, Dr. Ofori recommend that his lipid profile be repeated and that adjustments be made appropriately. (*Id.*). Finally, Dr. Ofori requested that no changes be made to Mr. Nussbaum's medications. (*Id.*).

On March 10, 2021, Mr. Nussbaum again met with Dr. Mahmood for his spine and bilateral leg pain. (Tr. 934). He rated his pain as a seven on a scale of ten. (Tr. 934). Dr. Mahmood noted that Mr. Nussbaum remained "very hesitant" about any advance interventions/injections and stated that he planned to continue during physical therapy, which Dr. Mahmood noted "does provide

temporary relief." (*Id.*). Mr. Nussbaum requested a refill of his medications, including Mobic. (*Id.*).

On April 13, 2021, Mr. Nussbaum reported to Dr. Ganta that when he worked, he had "more issues in one or [two] spots that are very painful." (Tr. 970). Dr. Ganta observed that Mr. Nussbaum's MRI shows "some" degenerative disc disease and "minimal facet arthritis." (*Id.*). Mr. Nussbaum reported that, due to his glycogen storage disease, he feels "tired all the time [and] his muscles are fatigued." (*Id.*). Dr. Ganta's diagnoses were mixed hypertriglyceridemia "under good control," hypertrophic cardiomyopathy, glycogen storage disease, dyslipidenia "in good control," and tobacco use and abuse disorder. (Tr. 972-73).

On July 22, 2021, Mr. Nussbaum reported that he was using Gabapentin to treat his back pain but that it "is really not helping him much at all." (Tr. 1050). He reported feeling tired on Gabapentin, so Dr. Ganta noted that she would consider weaning him off it. (Tr. 1050). Dr. Ganta decreased the Gabapentin dosage at this visit. (*Id.*). Upon physical exam, Mr. Nussbaum had normal findings. Specifically, Dr. Ganta observed that Mr. Nussbaum was well-appearing, alert, in no acute distress, and well-nourished. (Tr. 1052). Dr. Ganta observed no deformities, edema, skin discoloration, and clubbing or cyanosis in Mr. Nussbaum's extremities. (*Id.*). Dr. Ganta also observed that Mr. Nussbaum's extremities had good capillary refill. (*Id.*). Dr. Ganta noted that Mr. Nussbaum's high triglycerides were in "good control" and continued his current medication. (*Id.*). She noted the same diagnoses for Mr. Nussbaum: hypertrophic cardiomyopathy, high triglycerides, asymmetric septal hypertrophy, mild pulmonary hypertension, chronic diastolic congestive heart failure, glycogen storage disease, osteoporosis, recurrent major depressive disorder, and fibromyalgia. (Tr. 1052-53).

## 2.  *Medical Evidence Submitted After Hearing*

On January 27, 2022, Mr. Nussbaum met with Dr. Chitra. Mr. Nussbaum reported no peripheral weakness, paresthesias, or numbness of concern. (Tr. 82). Upon physical exam, Mr. Nussbaum had no deformities, edema, skin discoloration, clubbing, or cyanosis in his extremities. (Tr. 83). His extremities also had good capillary refill. (*Id.*).

On March 24, 2022, Mr. Nussbaum saw Mr. Jacob Ehlers, PA-C, and reported concerns with pain, paresthesias, and decreased range of motion in his hands. (Tr. 45). Mr. Nussbaum denied any specific injury or trauma and said that he had "progressive symptoms for several years." (*Id.*). The examination revealed mildly decreased range of motion about the cervical spine with evidence of cervical radiculopathy, positive Tinel's and Phalen's overlying the median nerve at the wrist as well as the ulnar nerve to the cubital tunnel, significant intrinsic tightness bilaterally with difficulty with finger extension to the MCP joint. (Tr. 47). Mr. Ehlers diagnosed bilateral hand pain, hand muscle weakness, intrinsic muscle tightness, contracture of joint of a finger, carpal tunnel syndrome bilaterally, cubital tunnel syndrome bilaterally, and cervical radiculopathy. (*Id.*).

On March 31, 2022, the study interpretation of his EMG of his right upper extremity stated that the EMG demonstrates findings most consistent with: "Myopathic motor unites are seen diffusely in the proximal greater than distal muscles of bilateral upper extremities, without associated active muscle fiber irritation (fibrillation potentials). A single brief train of myotonic discharges was seen; however, myotonic discharges were not seen in other tested muscles. These findings are most consistent with a generalized myopathy." (Tr. 273).

During an appointment with Dr. Yonatan Spolter, a neurologist, Mr. Nussbaum reported that he had some trouble extending his fingers, muscle issues ran in his family, there was some family history of muscular dystrophy, and his grip would get "stuck" at times. (Tr. 262). He also

reported some muscle loss in the lower extremities, some numbness in the right arm with leaning, some pain at times in the wrist, and was diagnosed with glycogen storage disease based on a liver biopsy. (*Id.*). Upon examination, Mr. Nussbaum revealed a slightly wide based but stable gait, and zero reflexes in the biceps, triceps, and patellar. (Tr. 266). Dr. Spolter's assessment was a history of chronic distal muscle wasting, mild muscle weakness, hypertrophic cardiomyopathy, and family history of muscular dystrophy. (Tr. 268). He further remarked that Mr. Nussbaum's glycogen storage disease type was not one associated with myopathy but noted that there are other conditions "biochemically similar" to glycogen storage disease associated with myopathy. (Tr. 268-69). Dr. Spolter also indicated that genetic testing for glycogen storage disease "would be helpful i[n] solidifying the diagnosis, to determine whether the myopathy is associated with" glycogen storage disease. (Tr. 269). He further noted that other diagnostic consideration would include myotonic dystrophy, or other hereditary muscular dystrophies, but indicated that "this would be a completely different and unrelated condition" to glycogen storage disease. (*Id.*). "Given the complexity of the situation," Dr. Spolter referred Mr. Nussbaum to medical genetics to help plan appropriate genetic testing. (*Id.*).

On June 2, 2022, Mr. Nussbaum had a genetics consultation with Dr. Adnan Alsadah. (Tr. 17). Mr. Nussbaum reported experiencing muscle weakness and contractures. (*Id.*). (*Id.*). He reported experiencing more achiness in his muscles, weakness and stiffness, difficulty releasing his grip, and taking a "little longer to open [his] eyes are squeezing [them] shut." (*Id.*). Dr. Alsadah indicated that Mr. Nussbaum had a complex medical history including glycogen storage disease, muscle weakness, contractures, hyperlipidemia, and hypertrophic cardiomyopathy. (Tr. 23). Dr. Alsadah recommended two types of genetic testing: (1) a glycogen storage disease genetic panel to "try reaching a loecular diagnosis, which may have potential prognostic and management

implications"; and (2) myopathy/reflex to neuropathy genetic panel to "try reaching a unifying diagnosis since it looks like his muscle weakness's etiology i[s] unclear." (*Id.*).

On June 4, 2022, an x-ray of Mr. Nussbaum's hands revealed volar subluxation of the right fifth PIP joint and flexion deformities at the volar subluxation of the fifth, third, and fourth PIP joints on the right hand, and mild flexion deformity of the fifth PIP joint on the left hand. (Tr. 43).

## IV.  THE ALJ'S DECISION

In her September 2021 decision, the ALJ determined that Mr. Nussbaum had not engaged in substantial gainful activity since October 1, 2020, the amended alleged onset date. (Tr. 201). The ALJ further determined that Mr. Nussbaum had the following severe impairments: idiopathic hypertrophic obstructive cardiomyopathy; status post prior mitral valve repair; congenital glycogen storage disease with associated hypertriglyceridemia and hypercholesterolemia; osteopenia of the lumbar spine; degenerative disc disease of the lumbar spine and thoracic spine; depressive disorder; and borderline intellectual functioning. (Tr. 201-02). The ALJ, however, found none of these impairments—individually or in combination—met or medically equaled the severity of a listed impairment in 20 CFR Part 404, Subpart P, Appendix. (Tr. 203).

The ALJ also determined that Mr. Nussbaum could perform sedentary work, except that he can occasionally push and/or pull with his bilateral upper extremities and with his bilateral lower extremities. (Tr. 206). Mr. Nussbaum was further limited to the following nonexertional limitations: never climbing ladders, ropes, or scaffolds; occasionally climbing ramps and stairs; occasionally balancing, stooping, crouching, kneeling, and crawling; never working at unprotected heights or around moving mechanical parts; is able to perform simple, routine, and repetitive tasks; can have occasional interactions with supervisors, coworkers, and the public; and is able to tolerate only few changes in a routine work setting. (Tr. 206-07).

13

The ALJ next determined that Mr. Nussbaum was unable to perform any past relevant work. (Tr. 220). She also determined that transferability of job skills was not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a "not disabled" finding regardless of whether Mr. Nussbaum has transferable job skills. (Tr. 221). However, the ALJ determined that, considering Mr. Nussbaum's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Mr. Nussbaum can perform, including a document preparer, addresser, and table worker. (Tr. 222). Accordingly, the ALJ determined that Mr. Nussbaum was not disabled. (Tr. 223).

## V. LAW AND ANALYSIS

### A. <u>Standard of Review</u>

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App. 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a

reviewing court would decide the matter differently[.]" *Cutlip*, 25 F.3d at 286; *Kinsella v. Schweiker*, 708 F.2d 1058, 1059-60 (6th Cir. 1983).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) (alteration in original)).

### B.  Standard for Disability

The Social Security regulations outline a five-step sequential evaluation process that the ALJ must use in determining whether a claimant is disabled: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of his RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the

15

national economy. 20 C.F.R. § 404.1520(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that he is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a). Specifically, the claimant has the burden of proof in Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC to perform available work in the national economy. *Id.*

### C. Analysis

#### 1. *The ALJ Appropriately Evaluated Dr. Ganta's Opinion.*

Mr. Nussbaum argues that the ALJ erred in evaluating the persuasiveness of: (1) Dr. Ganta's February 3, 2021 medical source statement; and (2) Dr. Ganta's April 13, 2021 letter. (ECF Doc. 8, PageID#1112-14). Regarding Dr. Ganta's February 2021 medical source statement, Mr. Nussbaum asserts that the ALJ incorrectly found this statement unpersuasive because the medical records supported and were consistent with Dr. Ganta's opined limitations. (*Id.* at PageID#1113-14). With respect to Dr. Ganta's April 2021 letter, Mr. Nussbaum argues that the ALJ erred by not providing analysis of the letter's supportability and consistency. (*Id.* at PageID#1114). Specifically, Mr. Nussbaum argues that the ALJ "at the least" should have provided an analysis of this letter because it: (1) was written after a medical source statement where Dr. Ganta provided limitations and stated that Mr. Nussbaum would have difficult working; and (2) was supported by and consistent with other medical records. (*Id.*). For the following reasons, I disagree.

16

### a. Evaluation of Medical Opinions (Step Four) – Standard

At Step Four of the sequential evaluation, the ALJ must determine a claimant's RFC after considering all the medical and other evidence in the record. 20 C.F.R. § 404.1520(e). In doing so, the ALJ is required to "articulate how she considered the medical opinions and prior administrative medical findings." 20 C.F.R. § 404.1520c(a). At a minimum, the ALJ must explain how he considered the supportability and consistency of a source's medical opinion(s), but generally is not required to discuss other factors. 20 C.F.R. § 404.1520c(b)(2).4 According to the regulation, the more consistent a medical opinion is with the evidence from other medical and nonmedical sources, the more persuasive the medical opinion will be. This is the consistency standard. And the regulation specifies that the more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion, the more persuasive the medical opinion will be. This is the supportability standard. *See* 20 C.F.R. § 404.1520(c)(1)-(2).

### b. Dr. Ganta's February 2021 Medical Source Statement

The ALJ appropriately evaluated Dr. Ganta's February 2021 medical source statement and concluded:

> Dr. Ganta's medical opinion is not persuasive for a number of reasons. First, supportive rationale for these multiple extreme limitations in exertional, nonexertional, and other workrelated abilities was provided solely with a rote list of diagnoses and "pain all over" the body from the glycogen storage disease (Ex. C9F/1,2). Consequently lacking in support offered is any identified objective medical signs or other evidence, and Dr. Ganta did not discuss factors relating to mostly conservative courses of treatment for managing pain associated with DDD and osteopenia of the spine or the mild acetabular dysplasia, which an orthopedic specialist notably found to be incidental and likely not the source of any significant pain. Further, the opinion fails to state why limitations in reaching and manipulative abilities with the upper extremities would follow from any of these impairments, and her own office notes and other medical reports do not suggest pain or other symptoms affecting these nonexertional abilities. The statement that all listed environmental factors of noise, pulmonary irritants, temperature extremes, and

others would make "it" worse is vague and, even if fairly interpreted to refer to pain, does not follow. No cane is noted in Dr. Ganta's relevant chronology of office notes or other medical sources' records. The rating of severe pain and less than eight total hours of work ability fail to consider the conservative treatments that her own office notes show to be partially beneficial, and the normal gait and other unremarkable medical signs from the pain-management specialist, such as full 5/5 strength in the lower extremities, are simply not consistent with her extreme limitations in exertional and some postural abilities and in the opinions that pain will take the claimant off task and would cause regular absenteeism. Lastly, the opinion for need to elevate the legs is not only unexplained as well as inconsistent in degree of elevation (45 versus 90 degrees), but it also has no foundation in objective medical evidence that, per Dr. Ganta's own records and from other physicians' reports, has been at all points negative for observed edema in the lower extremities; and this is further inconsistent with the cardiologist continuing to hold on adding a diuretic medication to the claimant's medication regimen for managing cardiomyopathy. Overall, the undersigned cannot find Dr. Ganta's February 2021 medical opinion well supported or consistent with the total medical evidence in the record; as such, it is not persuasive about the claimant's maximum physical or other work-related abilities.

(Tr. 217-18).

Here, the ALJ addressed supportability in addressing Dr. Ganta's opinion. Supportability is defined as "[t]he more relevant the objective medical evidence and supporting explanations **presented by a medical source** are to support his or her medical opinion[]…the more persuasive the medical opinions will be." 20 C.F.R. § 404.1520c(c)(1) (emphasis added). The ALJ concluded that Dr. Ganta failed to provide supportive rationale for her opined limitations. (*See* Tr. 217). A review of Dr. Ganta's medical source statement supports the ALJ's conclusion. Here, as the ALJ concluded, Dr. Ganta only offered the following list of diagnoses in support of her assessments: hypertrophic cardiomyopathy; glycogen storage disease; congestive heart failure; lumbosacral, thoracic, and cervical spondylosis; myalgias; degenerative disc disease of the lumbar spine; mild acetabular dysplasia of the right side; and "pain all over from [glycogen] storage disease." (*See* Tr. 924-25). Dr. Ganta also listed Mr. Nussbaum's pain, congestive heart failure, and "very rare" glycogen storage disease as additional limitations that would "interfere with work [eight] hours a

18

day, [five] days a week." (Tr. 925). The ALJ correctly concluded that Dr. Ganta offered no objective medical signs or other evidence supporting the opined limitations. (Tr. 217; *see generally* Tr. 924-25); *see Price v. Comm'r of Soc. Sec.*, 342 F. App'x 172, 176 (6th Cir. 2009) (finding the ALJ did not err in discounting a doctor's opinion where the doctor failed to identify objective medical findings in support when filling out an opinion questionnaire). While Mr. Nussbaum attempts to supplement Dr. Ganta's opinion by offering medical records that he argues support Dr. Ganta's findings (ECF Doc. 8, PageID#1113-14), these records were notably absent from Dr. Ganta's February 2021 opinion (*see generally* Tr. 924-25). Because Dr. Ganta's opined limitations contain an absence of explanation and are unsupported by the record, the ALJ did not err in articulating the supportability factor.

The ALJ also addressed the consistency of Dr. Ganta's opinion. Consistency is defined as "[t]he more consistent a medical opinion[]…is with the evidence from other medical sources and nonmedical sources in the claim…the more persuasive the medical opinions(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(2). The ALJ offered multiple reasons for finding Dr. Ganta's opinion inconsistent. (Tr. 217-18). For example, the ALJ noted that Dr. Ganta opined that a cane is prescribed, but no cane was noted in her notes or any other medical source's records. (Tr. 218). The ALJ also pointed out internal inconsistencies within Dr. Ganta's opinion. Specifically, at one point, Dr. Ganta opined that Mr. Nussbaum required his legs to be elevated at a 45-degree angle, but then stated elsewhere that Mr. Nussbaum needs to elevate his legs at a 90-degree angle. (Tr. 218). The ALJ additionally observed that this leg elevation limitation was inconsistent with other records that had consistent findings of no edema in the medical records and no diuretic prescription to treat edema. (Tr. 210, 218; *see* Tr. 637, 651, 695, 925, 1000, 1004).

19

Although Mr. Nussbaum points to complaints of back pain he made to both Dr. Ganta and Dr. Mahmood to buttress his argument that Dr. Ganta's opinion was consistent with the record, the ALJ did in fact explain why Dr. Ganta's opinion was inconsistent regarding the pain limitation. Specifically, the ALJ stated:

> The rating of severe pain and less than eight total hours of work ability fail to consider the conservative treatments that [Dr. Ganta's] own office notes show to be partially beneficial, and the normal gait and other unremarkable medical signs from the pain-management specialist, such as the full 5/5 strength in the lower extremities, are simply not consistent with [Dr. Ganta's] extreme limitations in exertional and some postural abilities and in the opinions that pain will take the claimant off task and would cause regular absenteeism.

(Tr. 218).

And elsewhere in the decision, the ALJ discusses evidence that also supports her conclusion regarding the inconsistency of Dr. Ganta's opinion. (*See generally* Tr. 210-13; *see also Musolff v. Comm'r of Soc. Sec.*, No. 1:21-CV-1739, 2022 WL 1571864, at *12 (N.D. Ohio Apr. 24, 2022) (quoting *Buckhanon ex rel. J.H. v. Astrue*, 368 F. App'x 674-78-79 (7th Cir. 2010) ("[W]e read the ALJ's decision and as a whole and with common sense.")); *Crum v. Comm'r of Soc. Sec.*, 660 F.App'x 449, 457 (6th Cir. 2016) (unpublished) ("No doubt, the ALJ did not reproduce the list of these treatment records a second time when she explained why [the medical source's] opinion was inconsistent with this record. But is suffices that she listed them elsewhere in her opinion.").

For example, the ALJ discussed the unremarkable medical signs from the notes of Dr. Mahmood, Mr. Nussbaum's pain management specialist. Specifically, Dr. Mahmood observed non-antalgic gait and found full 5/5 strength throughout the bilateral lower extremities, negative straight-leg raising test, and intact sensory findings or a subjective report of decrease sensation in the right leg that was not in a spinal dermatomal distribution. (Tr. 213, 218; *see* Tr. 794-95, 843).

20

The ALJ also observed that Dr. Mahmood noted that Mobic[4] had been partially beneficial. (Tr. 213, 218; *see also* Tr. 839 (noting that Mr. Nussbaum "does feel the [M]obic has been helpful" despite pain remaining at baseline of 9/10)). Further, the ALJ noted that Mr. Nussbaum reported to Dr. Ganta that medication had been helpful during the night. (Tr. 213, 218; *see* Tr. 835 (noting that Mr. Nussbaum still had back pain and that "the gabapentin and meloxicam helps during the night but during the day he has a hard time")). Given the ALJ's discussion of this relevant information, the ALJ offered substantial evidence in support of her conclusion that Dr. Ganta's opinion was inconsistent.

Mr. Nussbaum points to certain specific aspects of Dr. Ganta's and Dr. Mahmood's notes that may lead toward a different conclusion.  But the ALJ offered ample reasoning when articulating why Dr. Ganta's February 2021 opinion was not supported by or consistent with the medical record. Thus, the ALJ complied with the regulations by assessing the opinion's supportability and consistency as required by the regulations. 20 C.F.R. § 404.1520c ("The most important factors we consider when we evaluate the persuasiveness of medical opinions or prior administrative medical findings are supportability…and consistency…). And the ALJ articulated substantial evidence supporting her conclusion, which was contrary to Mr. Nussbaum's preferred conclusion. "[W]hen a record presents substantial evidence supporting two contrary conclusions, a reviewing court must affirm the findings of the Commissioner." *Wines v. Comm'r of Soc. Sec.*, 268 F.Supp.2d 954, 960 (N.D. Ohio June 24, 2023) (citing *Buxton v.* Halter, 246 F.3d 762, 772 (6th Cir. 2001)). Because Mr. Nussbaum does not establish any error in the ALJ's analysis, I find that this sub-claim lacks merit.

---

[4] Mobic is the U.S. brand name for Meloxicam, a nonsteroidal anti-inflammatory drug used to relieve symptoms of arthritis such as inflammation, swelling, stiffness, and joint pain. *See* Mayo Clinic, Meloxicam (Oral Route), https://www.mayoclinic.org/drugs-supplements/meloxicam-oral-route/side-effects/drg-20066928?p=1 (last visited July 27, 2023).

### c.  Dr. Ganta's April 2021 Letter

The ALJ was not required to analyze Dr. Ganta's April 2021 letter as a medical opinion. Dr. Ganta's April 2021 letter merely stated "that [Mr. Nussbaum] was unable to work from October of 2020 due to medical conditions." (Tr. 993). An opinion that Mr. Nussbaum was "unable to work" is a disability determination reserved for the Commissioner. *See* § 404.1520b(c)(3); *Zingale v. Kijakazi*, No. 1:20-cv-02197, 2022 WL 824148, at *14 (N.D Ohio Mar. 18, 2022) ("The pertinent regulations provide that the ALJ is not required to offer 'any analysis' when it comes to issues reserved to the Commissioner, such as whether a person is disabled or not able to work.").

Furthermore, Dr Ganta's April 2021 letter does not constitute a medical opinion that the ALJ needs to evaluate. "A medical opinion is a statement from a medical source about what you can still do despite your impairment(s) and whether you have … limitations or restrictions in the following abilities…" 20 C.F.R. § 404.1513(a)(2). Wholly absent from Dr. Ganta's April 2021 letter is *any* discussion of what Mr. Nussbaum can still do despite his impairments, and whether he had limitations in his abilities. (*See generally* Tr. 993). Thus, the ALJ was not required to analyze or review the supportability and consistency of Dr. Ganta's April 2021 letter. Accordingly, I find that this sub-claim also lacks merit.

In sum, I recommend that the Court reject this assignment of error because: (1) the ALJ appropriately evaluated Dr. Ganta's February 2021 medical source statement by articulating the supportability and consistency factors and provided substantial evidence in support of her conclusions; and (2) the ALJ appropriately evaluated Dr. Ganta's April 2021 letter because it does not constitute a medical opinion under the current regulations.

### 2.  *The ALJ Was Not Required to Obtain Medical Expert Testimony.*

Mr. Nussbaum also argues that the ALJ erred by not having a medical expert present at the hearing to provide testimony regarding Mr. Nussbaum's severe impairments. (ECF Doc. 8, PageID#1115-16). Specifically, Mr. Nussbaum contends that the "esoteric nature" of his disability (glycogen storage disease) warranted the need for a medical expert. (*Id.* at PageID#1115). He asserts that the ALJ should have had a medical expert present at the hearing to provide testimony about the nature of his disease, the reasonableness of its symptoms, and "what limitations would be reasonable in light of this condition and the complications that arise from it." (*Id.* at PageID#1116). I disagree.

An ALJ "has *discretion* to determine whether further evidence, such as additional testing or expert testimony, is necessary." *Foster v. Halter*, 279 F.3d 348, 355 (6th Cir. 2001) (emphasis added).  Significantly, "the regulations do not require an ALJ to refer a claimant to a consultative specialist, but simply grant him the authority to do so if the existing medical sources do not contain sufficient evidence to make a determination." *Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir. 1986).  Mr. Nussbaum fails to establish how the existing medical sources did not contain sufficient evidence for the ALJ to make a determination. Mr. Nussbaum also offers no case law in support of his argument that the ALJ was *required* to obtain medical expert testimony. Accordingly, I find this claim lacks merit.

### 3.  *Sentence Six Remand is Not Warranted Because the New Evidence is Not Material and Mr. Nussbaum Did Not Establish Good Cause for Not Submitting this Evidence to the ALJ.*

Mr. Nussbaum argues that evidence he submitted after the ALJ's decision merits remand because this evidence relates to his severe impairments – and that if this evidence was before the ALJ, it is probable the ALJ would have reached a different conclusion. (ECF Doc. 8,

PageID#1116-17). Although Mr. Nussbaum (represented by counsel) does not identify what type of remand is required in his merits brief (*i.e.*, sentence four or sentence six remand) and did not file a reply, I construe Mr. Nussbaum's argument to be that remand is required under sentence six of 42 U.S.C. § 405(g) because the evidence was new and material, not available at the time of the hearing, and might have led the ALJ to reach a different conclusion. (*See id.*). The Commissioner responds that Mr. Nussbaum fails to demonstrate good cause, and that the post-decision evidence is not material. (ECF Doc. 10, PageID#1126-29).

It is undisputed that this evidence is "new" because it post-dates both the hearing and the ALJ's decision. *See, e.g.*, *Franson v. Comm'r of Soc. Sec.*, 556 F.Supp.2d 716, 725 (W.D. Mich. 2005) (finding doctor's post-hearing statement is "new" because it was generated after the ALJ's decision); *Heck v. Comm'r of Soc. Sec.*, No. 1:20CV2133, 2021 WL 6693720, at *13 (N.D. Ohio Dec. 28, 2021), *report and recommendation adopted*, 2022 WL 228163 (N.D. Ohio Jan. 26, 2022). But Mr. Nussbaum's final assignment of error is not well-taken because he fails to demonstrate: (1) good cause; and (2) that his newly submitted evidence is material.

### a. Sentence Six Remand Standard

The Sixth Circuit explains that "where the Appeals Council considers new evidence but declines to review a claimant's application for disability insurance benefits on the merits, the district court cannot consider that new evidence in deciding whether to uphold, modify, or reverse the ALJ's decision," and can only consider it as the basis for a sentence six remand. *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996). Under Section 405(g), there are two kinds of remand: (1) a "sentence four remand" made in connection with a judgment affirming, modifying, or reversing the Commissioner's decision; and (2) a "sentence six remand" where the court makes no substantive ruling as to the correctness of the Commissioner's decision. *See*

*Melkonyan v. Sullivan*, 501 U.S. 89, 97-101 (1997); *see also Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 486 (6th Cir. 2006). District courts may not consider evidence that was not submitted to the ALJ in the sentence four context, but may consider such evidence to determine whether a sentence six remand is appropriate. *See Bass v. McMahon*, 499 F.3d 506, 513 (6th Cir. 2007).

The burden of showing that a remand is appropriate rests with the claimant. *See Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). To justify sentence six remand, Mr. Nussbaum must demonstrate that the evidence he now presents in support of a remand is new and material, ***and*** there was "good cause" for his failure to present this evidence in the prior proceedings. *See Hollon*, 447 F.3d 269, 276-78 (6th Cir. 2010) (finding claimant failed to meet burden of showing good cause for failure to submit evidence and that evidence was material).

Evidence is new "only if it was not in existence or available to the claimant at the time of the administrative proceeding." *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 276 (6th Cir. 201) (internal quotations and citations omitted). Evidence is material "only if there is a reasonable probability that the [Commissioner] would have reached a different disposition of the disability claim if presented with the new evidence." *Id.* (internal quotations and citations omitted). A claimant shows good cause by "demonstrating a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ." *Id.* (internal quotations and citations omitted).

### b. Mr. Nussbaum Did Not Demonstrate Good Cause for His Failure to Submit This Evidence to the ALJ.

Mr. Nussbaum fails to meet his burden to establish that there is good cause for his failure to submit this evidence to the ALJ. "The mere fact that evidence was not in existence at the time of the ALJ's decision does not necessarily satisfy the 'good cause' requirement." *Courter v. Comm'r of Soc. Sec.*, 479 F. App'x 713, 725 (6th Cir. 2012). Rather, with respect to timing, the

Sixth Circuit has taken "a harder line" approach to the good cause test and requires that a claimant provide "a valid reason for [her] failure to obtain evidence prior to the hearing." *Id.* (quoting *Oliver v. Sec'y of Health & Human Servs.*, 804 F.2d 964, 966 (6th Cir. 1986)); *see also Saliba*, 2022 WL 18811452, at *9 ("[A] claimant cannot simply point to the fact that the evidence was not created until after the ALJ hearing but must establish good cause for why she did not cause the evidence to be created and produced until after the administrative proceeding."); *Perkins v. Apfel*, 14 F. App'x 593, 598-99 (6th Cir. 2001). This requirement includes "detailing the obstacles that prevented the admission of the evidence." *Courter*, 470 F. App'x at 725.

Here, Mr. Nussbaum's merits brief advances *no* argument regarding good cause. (*See generally* ECF Doc. 8, PageID#1116-17). Indeed, the only mention of "good cause" is Mr. Nussbaum's brief mention of good cause in articulating the requirements for remand under Section 405(g). (*Id.* at PageID#1116); *see Franson*, 556 F.Supp.2d at 276 (finding no "good cause" for failure to submit medical records generated post-hearing when moving party failed to explain why the evidence was not obtained earlier and submitted to the ALJ before the ALJ's decision); *see also Cranfield v. Comm'r of Soc. Sec.*, 79 F. App'x 852, 859 (6th Cir. 2003) (unpublished) (finding no good cause for failure to submit post-ALJ-decision doctor reports when plaintiff "had months to prepare for the hearing" and "could have sought the reports earlier" or "contacted the doctors or visited their offices if the reports were important to her case").

Beyond labeling the evidence as "new and material," Mr. Nussbaum (represented by counsel) offers no explanation or justification for his failure to obtain and produce the records prior to the ALJ rendering her decision. *Heck*, 2021 WL 6693720, at *14 (finding claimant did not meet his burden to show good cause where claimant "offered no explanation or justification" for his failure to seek the relevant examinations, imagery, and/or opinions prior to his administrative

hearing); *Henderson v. Comm'r of Soc. Sec.*, No. 1:19-cv-2913, 2020 WL 7485144, at *11 (N.D. Ohio Nov. 24, 2020), *report and recommendation adopted*, 2020 WL 7480666 (N.D. Ohio Dec. 18, 2020). Absent any explanation or argument from Mr. Nussbaum, it is unclear upon what basis good cause exists for his failure to submit the evidence to the ALJ. Thus, Mr. Nussbaum has not shown "a reasonable justification for the failure to acquire and present evidence before the ALJ" and thus cannot show good cause. *Foster*, 279 F.2d at 357

Furthermore, Mr. Nussbaum's good cause argument is deemed waived for failure to articulate any argument. *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in a most skeletal way, leaving the court to … put flesh on its bones."); *Sanchez v. Miller*, 792 F.2d 694, 703 (7th Cir. 1986) ("It is not the obligation of this court to research and construct the legal arguments open to parties, especially when they are represented by counsel.").

Finally, Mr. Nussbaum's failure to seek to hold the record open for post-hearing evidence provides an additional basis to conclude that the request for sentence six remand is not supported by good cause. *See Bass*, 499 F.3d at 514 ("[P]laintiff's counsel did not seek to have the record remain open to submit the evidence here provided, which in an of itself shows a lack of good cause."); *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 149 (6th Cir. 1996) (finding that failure to notify an ALJ at or following the hearing regarding the need to consider additional medical evidence prevented a claimant from later asserting good cause to submit new evidence).

### c.  The Submitted Evidence is Not Material.

Mr. Nussbaum argues that a March 2022 consultation, EMG of his bilateral upper extremity, hand x-rays, and multiple findings involving his hands and fingers are material because

it is "relevant to the time period in front of the ALJ." (ECF Doc. 8, PageID#1116-17). He argues that if the ALJ had this evidence, it is "quite possible" that the ALJ would have reached a different RFC determination. (*Id.* at PageID#1117). For the following reasons, I disagree.

Mr. Nussbaum does not establish that the March 2022 consultation is material because this evidence does not relate back to the ALJ's September 2021 decision. According to Mr. Nussbaum, he had a consultation "regarding his long-standing history of bilateral hand paresthesias[5] and decreased range of motion." (Tr. 45). Those examination findings included mildly decreased cervical range of motion, positive Tinel's and Phalen's signs, and intrinsic tightness bilaterally with difficulty with finger extension of the MCP joint. (Tr. 47). But Mr. Nussbaum fails to point to any evidence in the record supporting that these symptoms were long-standing. (*See generally* ECF Doc. 8, PageID#1116017). Upon independent review of the record and Mr. Nussbaum's merits brief, there is no mention of paresthesias within the medical record. And, as pointed out by the Commissioner, there is contrary evidence from January 2022 where Mr. Nussbaum saw Dr. Ganta and denied paresthesias. (Tr. 82). To the extent that Mr. Nussbaum now attempts to argue that the March 2022 consultation demonstrates a long-standing history of decreased range of motion in his bilateral hands, Mr. Nussbaum fails to point to any evidence in the medical record supporting this claim. (*See generally* ECF Doc. 8, PageID#1116-17). Thus, Mr. Nussbaum does not demonstrate that the March 2022 evidence of paresthesia and decreased hand motion relates back to the ALJ's September 2021 decision.

To the extent that Mr. Nussbaum attempts to establish that the March 2022 consultation relates back because there is evidence of "mildly decreased" cervical range of motion, this argument fails. The ALJ had discussed Mr. Nussbaum's issues involving his decreased cervical

---

[5] Paresthesia is the feeling of tingling, numbness, or "pins and needles." *See* Cleveland Clinic, Paresthesia, https://my.clevelandclinic.org/health/symptoms/24932-paresthesia (last visited July 31, 2023).

range of motion. Specifically, the ALJ discussed Mr. Nussbaum's February 8, 2021 consult with Dr. Pierce where Mr. Nussbaum presented with signs of pain-limited lumbar spinal range of motion. (Tr. 212; *see* Tr. 928). This evidence is cumulative of other record evidence. Evidence is not "material if it is cumulative of evidence already in the record…" *Kinsley v. Berryhill*, No. 5:17-cv-00604, 2018 WL 3121621, at *16 (N.D. Ohio Jan. 24, 2018); *Saliba v. Comm'r of Soc. Sec.*, No. 1:21-CV-1908, 2022 WL 18811452, at *9 (N.D. Ohio Nov. 3, 2022), *report and recommendation adopted*, 2023 WL 2139372 (N.D. Ohio Feb. 31, 2023).

Mr. Nussbaum also points to post-decision evidence of several findings involving his hands and fingers, including positive Tinel's and Phalen's signs, difficult finger extension and grip release, right arm numbness, wrist pain, and abnormal x-ray findings of subluxation and flexion deformities. (ECF Doc. 8, PageID#1116-17). But Mr. Nussbaum fails to demonstrate that there is a reasonable probability that the evidence would have changed the outcome for the relevant period. Here, as the Commissioner points out, there is evidence discounting these findings. For example, during the relevant period, Mr. Nussbaum reported doing activities such as driving a car and texting on his phone. (Tr. 583, 585). Further, Mr. Nussbaum did not report any difficulties using his hands during the relevant period.

Mr. Nussbaum's argument that the hand x-rays could have supported Dr. Ganta's limitation of occasional gross manipulation is unpersuasive. (*See* ECF Doc. 8, PageID#1117). Indeed, he appears to be commencing another challenge to the ALJ's persuasiveness evaluation of Dr. Ganta's February 2021 opinion. However, it is unclear how these x-rays would have changed the ALJ's decision because, as stated previously in this Report and Recommendation, Dr. Ganta failed to support her opinion with any objective exams or findings. Under the Social Security regulations, supportability is defined as "[t]he more relevant the objective medical evidence and supporting

explanations **presented by a medical source** are to support his or her medical opinion(s)…the more persuasive the medical opinion(s)…will be." 20 C.F.R. § 404.1520c(c)(1) (emphasis added). From the regulations, it appears the medical source needed to provide supporting explanations *at the time of issuing her opinion*. Here, the evidence Mr. Nussbaum relies upon was produced *after* Dr. Ganta had issued an opinion regarding those limitations. Whether Dr. Ganta would have supported her opinion with these x-rays is mere speculation given that these x-rays were not in existence when Dr. Ganta provided her opinion. Moreover, given the numerous other reasons articulated by the ALJ for why Dr. Ganta's opinion was unpersuasive and inconsistent, it is questionable that the mere introduction of these x-rays would have caused the ALJ to reach a different disposition regarding Dr. Ganta's opinion and ultimately changed the ALJ's RFC determination. (Tr. 217-18). Accordingly, I do not find that Mr. Nussbaum has demonstrated the materiality of the x-rays on this basis.

Finally, Mr. Nussbaum's argument that the EMG is relevant to the time period because the findings "were consistent with a generalized myopathy, which provided a base for [his] complaints" is not well-taken. (ECF Doc. 8, PageID#1117). Mr. Nussbaum asserts that this EMG is consistent with generalized myopathy. But Dr. Spolter did not diagnose Mr. Nussbaum with generalized myopathy. Instead, Dr. Spolter diagnosed Mr. Nussbaum with a history of hypertrophic cardiomyopathy, chronic distal muscle wasting, mild muscle weakness, and familial history of muscular dystrophy. (Tr. 268). Dr. Spolter then noted that Mr. Nussbaum had a recent EMG demonstrating "fairly diffuse myopathic motor units **suggestive of** an underlying chronic myopathy, without significant muscle irritability." (*Id.*) (emphasis added). Further, because Mr. Nussbaum failed to make any argument regarding good cause, it is unclear why he did not obtain such an EMG earlier.

In sum, I recommend that the Court reject this assignment of error because a sentence six remand is not supported by the record or arguments offered in this case.

## VI.    RECOMMENDATION

Based on the foregoing, I RECOMMEND that the Court reject Mr. Nussbaum's assignments of error and AFFIRM the Commissioner's final decision.

Dated: August 1, 2023                                  s/ *Jennifer Dowdell Armstrong*
                                                       Jennifer Dowdell Armstrong
                                                       U.S. Magistrate Judge


## VII.    NOTICE TO PARTIES REGARDING OBJECTIONS

Local Rule 72.3(b) of this Court provides:

> **Any party may object to a Magistrate Judge's proposed findings, recommendations or report made pursuant to Fed. R. Civ. P. 72(b) within fourteen (14) days after being served with a copy thereof, and failure to file timely objections within the fourteen (14) day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure**. Such party shall file with the Clerk of Court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. **Any party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.** The District Judge to whom the case was assigned shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. The District Judge need conduct a new hearing only in such District Judge's discretion or where required by law, and may consider the record developed before the Magistrate Judge, making a determination on the basis of the record. The District Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

*Id.* (emphasis added).

Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *Berkshire v. Beauvais*, 928 F.3d 520, 530-531 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; a general objection has the same effect as would a failure to object. *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).

Stated differently, objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).